Good morning, Illinois appellate court first district court is now in session, the fourth division. The Honorable Justice Bertina Lampkin presiding case number 21 dash 0846 people versus key on Randall. Thank you, Darren. Good morning everyone I'm sorry that we did. We are delayed. Starting, I'm going to ask that each side identify them. Set themselves for the record and what party you represent in terms of the time for oral argument. We give both sides 15 minutes the appellate can reserve, however long you want for your rebuttal. And if we ask you questions certainly. And it takes more than 15 minutes will give the other side, the same amount of time. So if the parties would just identify themselves. My name is Yasmin of I am counsel for Keon Randall, on behalf of the state appellate defender and counsel how much time do you want to reserve for rebuttal. If I could reserve three minutes, please. That's fine. Good morning, your honors, I'm assistant state's attorney Aaron slattery on behalf of the people. All right. I am this is a Navi, you can begin. Yes, thank you. Thank you. May it please the court. Good morning, your honors. Good morning, counsel. The issues today that I will be arguing is, is the suppression issue. And it's really a narrow question before your honors today. And that is, did the police have probable cause to believe that a gun was inside of Keon Randall's car following a routine traffic stop for minor traffic violations. And the reason for this is that the state makes a number of important concessions. First, the state does not contest the illegality of the initial search, following these routine traffic infractions. The officer, Officer Clark Camilla Clark testified at the suppression hearing that she believed that defendant, or Mr Randall was making a furtive movement towards lead by leaning towards the left lower quadrant of the passenger side of the vehicle. She speculated that this was an attempt to secret a weapon that latter portion of her testimony. The trial judge did not credit. He said that all she could determine was that he was determining, moving to the left to the passenger side of the lower quadrant of the passenger side vehicle. And based on the fact that he couldn't rule out the possibility of innocent conduct that was declared unconstitutional. The state also does not content contest that we don't have an Arizona began problem. Certainly, the police would not be expected to find evidence of a traffic violation within the body of the car, nor would they find a technical violation with for a city ordinance. So, moving on to the crux of the issue today, and that is probable cause the defendant's position would be that there is no probable cause, and that's informed by a number of factors. The impropriety of the searches is self evident in the larger video, the defendants exhibit one which was introduced at the suppression hearing, and which is part of your record your honors. What we see is repeated attempts to search this vehicle in areas of the car, where Mr Randall was not seen leaning and in areas of the car, where one would not expect to find a gun. Very specifically I'm referring to, like, for example, the door handles the area where she searches in fact that's one of the first areas that she had she goes straight to. And that would be the window controls in the door paint. She goes into those areas. And it's clear that we would not expect to find a gun in that direction. She also looks within the passengers clutch, it's a tiny clutch. Again, we would not expect to see a gun. If that is in fact what they found. She also searches the trunk of the car, the very second search the legality of which we are debating here today begins with the trunk of the car. There was no improper movement in that direction, nor was there probable cause based upon this, what we see here is that the officer was operating on a hunch of illegality, based upon initially be just this furtive movement, which again the court initially ruled out was consistent with with innocent conduct, or you couldn't rule out the state sites, three factors. None of them support probable cause nervousness, and the officer testified officer Camilla Clark testified that the reason she believed that Mr Randall was nervous was that he was making sudden utterances without directly answering the question that is her specific testimony. The state sites, a number of traffic infractions. These traffic infractions. One, they would not necessarily be indicative of nervousness, the overshooting of the red light, in fact, was done at a time when the stop had not been initiated, and there's no indication that defendant, Mr Randall knew that the, the unmarked police car was a police car. In fact, the stock was initiated after that. There was also a failing to put the car into park, which is cited, and that that's not reflected entirely in the, the larger video, your honors, but nonetheless, we have to think about the timing of the incident. I checked. This is one month after the death of George Floyd. So, nervousness and I think this is our greater understanding now within Illinois case law I'm directing you to people be Horton is nervousness is to be expected. Not actually, it would be abnormal. If a young black man at that time was not nervous at being ordered out of the car. Then we turn to the movement to the passenger side of the vehicle. We have a thorough three minute search by my estimation, and beginning with the door frames that had already revealed nothing in the passenger side of the car. So the operating assumption should have been that there wasn't a gun in the vehicle there. And in fact, as I mentioned earlier, the judge just basically discounted the import of a large portion of that testimony. So we are at the lapse compliance with the gun registry. That too, is not compelling evidence. First of all, all the technical violation tells us is that the individual has a conviction. After 2013 sometime after 2013 for a qualifying gun offense and currently lives in Chicago. But understand that. So we basically have a prior criminal history, but Sims and Marcella Marcella which the state does not address in their reply brief instruct us that neither of those factors are sufficient to supply probable cause. And we look at the facts in that case. In Sims, the officer knew the defendant saw him making a furtive movement stuffing an item in his pants, which similar to Officer Clark here, he testifies. He believed was indicative of secreting a weapon. And in fact, like I said, he knew that the defendant had a prior gun offense. So the trial court ruled, or the appellate court ruled, I'm sorry, that the officers knowledge of the criminal background. So even when supplied or combined with the furtive movement, the stuffing of the pants without more gave rise to a hunch of criminal activity, but not even reasonable suspicion. So under the lower standard even Sims was evaluating that was not enough. And then we turn to Marcella. And this is an interesting case as well because officers had a whole lot of information. They had a pilot defendant who had an erratic flight path. He did not declare until mid-flight that his flight plan, which concealed his point of origin. That in fact, that evidence was that that airport was known for drug trafficking. Defendant also actually had a criminal history, quite a prolific criminal history of prior convictions for large amount of drugs. And on top of that, he had a conviction for tax evasion, also kind of akin to those kinds of offenses. And he finally, he flew a passenger convicted of possession of 1000 kilograms of cocaine. The police had all of this information, and yet there was no probable cause to arrest. The court held that the dated criminal history, the flight path, and the proximity to the Mexico airport were simply not enough to rule out the fact that there might have been, because a large number of these could have had innocent explanations. And here too, we have a, basically a movement towards the left side of, or to the passenger side, I'm sorry, lower passenger side of the car, which we don't know what it is. They could be moving any number of things. They didn't have any suspicion as to Mr. Randall. We have nervousness, which given the time is to be expected. And if your honors look at that video, it is clear that they were operating on a hunch of criminal activity and not necessarily of evidence of probable cause of a gun. They're looking in areas where you could not possibly have had a gun and where the defendant was not seen reaching. So if there are no questions, your honors, we would simply ask that this court reverses Mr. Randall's conviction outright. I don't have any questions. Thank you, counsel, Justice Rochford or Justice Martin. No questions. All right, thank you. Ms. Slattery. May it please the court, counsel. The trial court properly denied defendants pretrial motion to suppress for the search of his vehicle during the course of a lawful traffic stop was supported by probable cause in accordance with the automobile exception to the warrant requirement. Here, a review of the totality of the circumstances considered together and not in a piecemeal fashion supports the trial court's conclusion that the total circumstances known to the officers at the time of the search, they had probable cause to believe that defendant's vehicle contained contraband or evidence of criminal activity. Now, first, we have to look at the defendant's furtive movement. It's not a single furtive movement in this case, and the nature and circumstances of the defendant's movements are significant. Officer Clark testified that upon seeing that defendant was driving a vehicle without a front plate, her partner performed a U-turn and maneuvered directly behind defendant's car. According to Officer Clark, at that point, defendant immediately began making repeated furtive movements in the direction of the front passenger seat. Let me stop you for one second there. I thought she said that they made the U-turn, and then from 50 feet away, she saw these furtive movements, and it was when they were stopped at the red light. And she was 50 or less feet away. This is disturbing me, Kels, I'm sorry, but I've looked at this tape three times. And after that U-turn, certainly within 30 seconds, they pulled that car over. I don't know how you could see all of this in that short period of time. I just, because I've seen the tape, I think everybody has seen this tape. So, and you correct me if I'm wrong, but she did say she was 50 or less feet away when she saw these furtive movements through a certainly tinted glass, back glass window. Yes, so she did testify that when she saw the furtive movements, they were about 50 feet away. And apparently it started, at one point, she said it started while he was in the intersection. At another point in her testimony, she said it was before he entered the intersection. And then we also, because we can look at trial testimony as well, Officer Prothrow, who didn't testify at the depression hearing, but testified at trial, said that he observed the defendant making another furtive movement after the car was already pulled over to the side of the road. So, in this case, we have, you know, not just a single movement like in people versus Sims. We have, based on the officer's testimony, apparently multiple furtive movements in the direction of the front passenger seat. And they're very specific. They're saying like they could see his shoulder leaning in that direction. And relying on her experience and training as an officer, Officer Clark expressly testified that it appeared to her as if he was actively trying to conceal something. And the fact that there's some evidence that these movements occur before he blows the red light shows that he's so distracted in what he's doing. You said he blew the red light. No one said he blew the red light. He stopped in the intersection and didn't get out of the intersection until the light turned back to green. And we're at choice, yes. But again, that just shows that, you know, he's distracted by making these movements after this police vehicle maneuvers directly behind his own car. So, and again, the types of movements that issue in this case are very significantly different than that issue in people versus Sims where the officer simply observes the defendant make a single movement and appears to put something in his pants. And another factor we have here that is not present in Sims is nervousness. And again, it's not necessarily surprising that someone in a traffic stop is nervous, but we have some indications that the level of nervousness that defendant displayed was kind of significant. Tell me how, because I've seen the tape. The officer stops the car. They approach on both sides. They actually get this young man out of the car in less than a minute. I can't tell what Officer Protho is saying to him on the driver's side, but I know that the young man takes his hands and puts them on the steering wheel. They have some conversation back and forth. And he has this young man out of the car, handcuffed and patted down within a minute. And I didn't see, I personally didn't see any indication of him being nervous other than the fact that he's being handcuffed and patted down on the street. I don't see it. That's why I'm saying, I'm looking at the tape and I'm looking for what the officer's calling nervousness. So, specifically, Officer Clark testified that the manner in which the defendant was interacting with Officer Protho was a little bit unusual. So he wasn't answering direct questions. It was making these utterances. In addition to his own, whatever verbal responses or lack of responses, his behavior as well seems to indicate nervousness. One, when he pulled over, he jumps the curb. Two, he forgets to put the car in park and has to be reminded when he is to do so before exiting the car. And granted, all this happens rather quickly, but again, it's demonstrative or allows for an inference that the defendant is nervous during this interaction. And perhaps is more nervous than a normal person would be if they're just going to get a traffic ticket. And then we get to the whole registration issue. Let me just, I want to, and I'm sorry I'm interrupting you. Looking at this, I have to say I was disturbed by this tape. But looking at the tape, and everybody agrees the first search is illegal. How do you get to the second search when you had such an unbelievably thorough search the first time? I'm looking, I'm trying to look at what a reasonable officer would think. He leaned over to the side. He barely goes over the curb, really. It's not like jumping the curb and going into the grassy area and going into the parkway. This one tire of the car on the passenger side is up on a curb. And it doesn't even take that whole little concrete, I don't know, what is it, four or five inches thick that it's up on the curb. My thought is, because the judge really didn't credit the leaning or the nervousness as a basis for probable cause by themselves. What if the officer at that time thought that there was a weapon in the car? And I'm going to say what I saw, because I don't see how you get to go to another search. This officer, the female officer, once the young lady is out of the car, goes back to the car. Now, the furtive movement is supposed to be down toward the passenger floor is what I'm getting. She opens this lady's purse, it must be two inches, not even two inches, probably one inch wide. Before she even opens her purse, I have to go back. She opens, you can hear, you can't see, but you can hear her open the glove compartment and then close it. And look in the purse and look under the seat, the passenger seat, and look on both sides of the passenger seat. She doesn't see anything there, she goes to the, I'm sorry. The part where the electric window up and down thing works, she pulls that out. Of course, it's not big enough to put a gun in, maybe drugs though. So it's like she's looking for anything, not necessarily for a weapon. She pulled out the part where you do the electric windows, and then she looks at the part on the passenger door where you can put, I put junk in that part. Then she goes to the driver's side, and she looks underneath the, I'm sorry, while she's on the other side, she also looks in the console area. Then she goes to the driver's side. On the driver's side, she searches under the driver's seat. Then she actually pulls out the part of it that makes the windows go up and down. Actually takes it out of the car, looks at the little part where you can again put things. And she tries to pull the door panel to see if the door panel is removable. Then she goes to the back passenger, I mean driver's side, searches it. It's like she tries to raise up the seat on the rear driver's side to see if anything's under it. Of course, nowhere they've seen any kind of action. Then she goes back to the passenger side, and she searches the passenger side again. I've actually, I mean, I've not heard anybody testify to a more thorough search, and they find nothing. So, how did they get to go back and search again? And this is the part, one of the parts that disturbed me even more. On the video, the male officer says to the female arrestee, and they do arrest her. I don't know for what. She's handcuffed, they call. They put her in a car to take her away and basically say, we're taking you away because you lied. It didn't tell us that there was a car and a gun. You knew there was a car and a gun. I mean, a gun in the car. But he says, and this is what disturbs me. I hope somebody can tell him this. I was almost angry. He says, when he's talking to her on the tape, two times, I saw you making movement. I saw you making movements, not just him. I saw you, and then they find out she has the concealed carry. And my mind is, I go to, it's her guy. That's where my mind goes to, because he's saying twice she moved this, made these furtive movements. I think I'm kind of venting, because when I read the trial transcript, the police officer says she didn't move. Trying to imply that only the defendant moved, and that really disturbed me. I think, as I said, Ms. Ladder, I think I'm just venting, because the defense lawyer didn't bring that out. And that just disturbed me. But after you get this completely thorough search, how do you get to probable cause when the judge says those two things alone, the furtive movement and the nervousness is not enough. But just because you have a failure to register charge that you can be arrested for, how does that get to you to have probable cause to search the car yet again? I just want to make the point, we're not conceding that the first search was wrong. I don't know where that was an explicit concession on behalf of the people. Obviously, what we're talking about in this brief is the second search that led to the recovery of the gun. I understand that the trial court made that finding that furtive movement and nervousness isn't enough to support probable cause. But I wouldn't necessarily concede. I think the nature of the movements and the nature of defendant's demeanor and nervousness would arguably support probable cause alone. That being said, with respect to the second search, the first search, as you say, was thorough. However, she did not have a flashlight, so it's kind of a debate how thorough it could really be if you're trying to look in certain parts of the car. And with respect to looking in certain containers, small things, when you're searching a car, you don't necessarily need to have probable cause for a specific item. So it doesn't necessarily have to be a firearm. It just has to be contraband or evidence of criminal activity. They could have had probable cause for drugs. I think what led her to believe, obviously, that what she was looking for during the second search was a firearm was when she ran defendant's name. So there's no dispute that we have a defendant with two prior firearm convictions. We have this failure to register. Ms. Lattery, let me interrupt you for just a moment as you're making that point. Then tell me, in the course of your discussion now, how does that lead her to go to the trunk? So in that second search, she begins with the trunk, right? She goes over to the driver's door, and she's asking him how to get into the trunk. And then she finally sees the lever and goes in. So if we're talking about probable cause that arises from this fervent movement down towards the passenger seat, how do we then, in the second search, which you've conceded yourself the first search was thorough, how do we now, if we think that this criminal activity was taking place within the passenger compartment of the car, do we get to the trunk of the car? So I think once you have probable cause to believe that this car contains evidence of criminal activity, I don't know if there's, it's hard to see. A lot of times there is access to a trunk through the backseat. And I don't know if that's the case. No, that's not what he's talking about. After the first search is completed, and she runs his name, and by the way, talks to the female who says she doesn't know if she has a concealed carry, and the lady cop says, yeah, your rent something shows you have a concealed carry. If you got it, and you got a gun in the car, it's okay. If you got the concealed carry, you don't have to lie to me. Then I was like, oh, is this her gun? The cop goes back to the car, goes to the driver's side, asks the defendant how to open the trunk. The defendant tells her how to open the trunk. Then she goes into the trunk and with her flashlight and looks around. By the way, this is seven something in the day, and the sun is out. I can see in the video that the sun is going down and how it hits the tops of the buildings. It's not dark outside at all, but she flashes her flashlight inside, and then she opens up two bags in the back of the trunk. Then she raises up the rug in the front trunk. Then she raises up the, I don't know, some kind of hard plastic or something that is over the spare tire and looks all in there. That's what he's talking about. If she thinks there's probable cause to search the car where he's laying down because he probably has a gun, why does she go to the trunk first and do this, again, thorough search of the trunk? I would argue that once she had probable cause to believe that this car contained contraband, whether that's drugs, firearm, or other evidence of criminal activity, she was permitted to conduct a thorough search of the vehicle, which there's not a case law saying that you can only look. When you have probable cause to search a vehicle, you can only look where you saw the defendant make a movement. I would argue that she didn't exceed the bounds of proper conduct by conducting a thorough search of the entirety of the vehicle. Again, talking about this registration, defendant's criminal history, that, again, is another significant difference than what was at issue in Peeble v. Marcella. One, the criminal history in that case, the court explicitly stated, was pretty far removed. It wasn't recent. Here, the latest firearm conviction for our defendant, I think, was in 2017. It was not that far removed like it had been in Marcella. Also, another significant difference is that in Marcella, the trial court specifically found aspects of law enforcement's testimony to be not credible, specifically with respect to one of the officers that testified that the other said he came from an airport near Mexico known for drugs. The trial court specifically found that he didn't believe that that exchange had been relayed. Here, there's no finding by the officer's testimony was not credible. The court made one statement about being able to see what was going on in the car. That was in response to, I believe it was the ASA's testimony during the argument that she could see him going, what exactly was going on in the passenger side. He said, unless you have x-ray vision, you're not seeing that because you can't see through the window. That wasn't to say that the officers were unable to observe any movement through what appears to be based on, I think, the PSI defendant's idea to 5% tint on his car. I think that those are some significant differences in this case. Ultimately, again, totality of the circumstances when considered together, collectively and not piecemeal, the state would argue was sufficient to support the trial court's conclusion that there was probable cause to search this vehicle. I don't have any more questions. Thank you. I wasn't stopping you. You kind of slowed down or stopped yourself. I wasn't sure if you were finished. Yes, unless there are any further questions or if you want me to address sufficiency. No, I don't. Justice Rashford or Justice Martin. I have no questions. Thank you. I'm not going to try to say your last name again because I'll put it in the wrong place. You're muted. I was going to say it's Nevada like Hawaii. That's probably an easier way. There's just a number of points I want to clarify, mostly because of the number of arguments that are new in the state. And just to clarify the record, this statement that you don't have to have, you have to have, that there might've been probable cause for drugs or that you don't have to specify. There is absolutely no evidence here relating to Mr. Randall or Ms. Dalton relating to drugs or guns for that matter. So that's number one. Number two, probable cause to search areas of the car is very much limited to the area where contraband is located. The state hasn't cited any cases for these propositions that are being raised for the first time. As far as the propriety of the first search and the discussion of Marcella, not only is the discussion of Marcella incorrect, is incorrect or not complete, but it's new for the first time. And as to the first search, it was a concession by omission. They never argued that that was an improper ruling. And yes, we are challenging the totality, the entirety of this police occurrence. So very much first search, second search is at play here. Just to clarify something, very start of the record, with regard to officer Prothrow and the furtive movement, the testimony I looked at this actually yesterday, I re-looked at everything. He says on page 240 and 241, and 241 is the critical clarification, that he sees a furtive movement toward the front passenger side to the bottom, to the same area as Clark testified to. And then on 41, it sounds like he's saying as they're approaching, but in fact, on 241, he clarifies, we were stopped at the intersection at the red light. So he too is making that observation at what Clark says is a distance of about 50 feet or so, just a slamping. So that, and one final clarification, Prothrow and Clark both testified that, and I think this is evident on the video, which I too have watched. And I'm talking about defense exhibit one now. I too have watched numerous times. It's 27 minutes in length. Minutes, I guess, 1.56 to the 15 minute mark are played at the suppression hearings. It is an interesting video all the way through. There are actually three searches, but both Prothrow and Clark testify that Mr. Randall obeyed their orders. And I think that's visible in the video promptly when told to put into park and such. So if there are no questions, your honors, we would just ask that this court reverse Mr. Randall's conviction outright. Thank you very much. I have no questions, Justice Rochford or Justice Martin. I do not. Thank you, counsel. Thank you both for a very interesting case. And shortly we will have a decision for you. At this time, we're going to be adjourned. The judges will stay.